UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFF COLE,

      Plaintiff,

                                      Case No. 06-13688

v.

                                        Honorable Patrick J. Duggan

HARMAN CORPORATION and
ADMINISTRATIVE EMPLOYER
SERVICES, Jointly and Severally,

      Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on November 27, 2007.

PRESENT:       THE HONORABLE PATRICK J. DUGGAN
                       U.S. DISTRICT COURT JUDGE

On August 18, 2006, Jeff Cole ("Plaintiff") filed this lawsuit against his former

employers, Harman Corporation ("Harman") and Administrative Employer Services

("AES") (collectively "Defendants"). In his Complaint, Plaintiff alleges three separate

counts: Count I (Violation of American's With Disabilities Act ("ADA")); Count II

(Violation of the Family and Medical Leave Act ("FMLA")); and Count III (Violation of

Title VII). Presently before this Court is Defendants' Motion for Summary Judgment.

Defendants' motion has been fully briefed, and on November 20, 2007, this Court held a

hearing on Defendants' motion.

# I.  Factual Background

"Harman is a second generation, family-owned business that manufactures and supplies dip molded vinyl products from its facility in Rochester, Michigan."  (Dfts.' Br. Ex. A, Ted Fisher Aff. ("Fisher Aff.") ¶ 5.)  AES is a professional employer organization that has entered into a Client Services Agreement ("CSA") with Harman "to directly employ and provide certain benefits and related services for the workers assigned to Harman's facility in Rochester, Michigan."  (Dfts.' Br. Ex. B, Susan Keith Aff. ("Keith Aff.") ¶ 3.)  During the time period relevant to this case, AES was the employer of Plaintiff "for the administrative and personnel purposes" AES agreed to provide for Harman in the CSA.  (*See* Pl.'s Resp. Br. Ex. 3 at 1.)

Plaintiff began working at Harman's Rochester, Michigan facility in June 1993. Initially, Plaintiff worked in Harman's print shop.  He was later transferred to the production department, and after spending about two years there, Plaintiff began working in Harman's maintenance department.

In December 2002, Plaintiff developed a problem with his right ankle.  Plaintiff's ankle problem was attributed to the significant varicose veins on his right ankle.  These varicose veins would become swollen and painful after prolonged periods of standing.  A specialist recommended that Plaintiff wear compression stockings to minimize the swelling and pain associated with his ankle problem.  According to Plaintiff, his "condition was worsened because the maintenance department was very short staffed and [he] had to do much more walking and standing on the cement from that [he] did before." (Pl.'s Resp. Br. Ex. 1 (hereinafter "Pl.'s Aff.") ¶ 6.)  The swelling and pain in Plaintiff's

ankle caused him to walk with a limp.  (*Id.* ¶ 8.)

Around the same time Plaintiff's ankle condition worsened, Plaintiff was told by Jack Harman, a founder of Harman, that Plaintiff was going to be fired because he "walked too slow."  (Pl.'s Dep. at 225.)  Plaintiff became concerned and spoke with John Johnston ("Johnston"), one of his supervisors, who told Plaintiff that Ron Harman said he walked to slow.  (*Id.*)

In early 2005, Randy Fox, one of Harman's maintenance supervisors, showed Plaintiff nude pictures of his wife, Melissa Fox, who also worked at Harman's Rochester, Michigan facility.  After Randy Fox showed Plaintiff the nude pictures, Melissa Fox approached Plaintiff, "smiled and said you need to see me on one of my better days." (Pl.'s Dep. at 286.)  This incident made Plaintiff "uncomfortable," particularly around Melissa Fox who Plaintiff would see around the facility often.  In addition, Plaintiff quit taking his lunch break in the maintenance area to avoid Melissa Fox.  (*Id.*)

Plaintiff later reported this incident to Johnston in April 2005.  Plaintiff told Johnston that Plaintiff's wife was upset about him seeing the pictures.  Johnston responded by laughing at Plaintiff and telling him that he should not have told his wife about seeing the pictures.  (*Id.* at 291.)  Johnston reported Plaintiff's complaint to Steve Roach, Mr. Johnston's supervisor.  The parties, however, dispute when or whether Harman investigated this incident before Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge in 2005.

On April 21, 2005, after Plaintiff complained about being shown the nude pictures, Johnston gave Plaintiff written notice that he was being transferred from the maintenance

department to the production department.  Plaintiff's transfer became effective on April

25, 2005 and also resulted in Plaintiff's schedule changing to one four-hour day and three

12-hour days.  (Pl.'s Resp. Ex. 6.)  After learning about the transfer, Plaintiff immediately

informed Johnston that he "would not be able to do the production job because of [his]

ankle."  (Pl.'s Aff. ¶ 12.)  While working in the production department, Plaintiff operated

up to five machines at once and was required to respond to warning bells on these

machines, which would sound whenever a machine malfunctioned.  (*Id.*)

Defendants maintain that Plaintiff's transfer was the result of an extensive

reorganization and restructuring necessitated by "severe economic pressures and

substantial financial losses that threatened Harman's continued existence."  (Dfts.' Br.

Ex. A ( hereinafter "Fisher Aff.") ¶ 6.)  As part of this reorganization, Harman's

Operations Manager, Ted Fisher ("Fisher"), met with Johnston "and another manager to

identify personnel in overstaffed departments with a 'dual skill' set that might be

candidates for inter-department transfer."  (*Id.* ¶ 9.)  Plaintiff was among the employees

identified by Fisher and Johnston, and according to Defendants, Plaintiff was transferred

to save him from being laid-off.  Plaintiff's transfer "did not impact [his] wages or benefit

options."  (*Id.* ¶ 12.)

Around the same time as his transfer, Plaintiff's teenage daughter was suffering

from anorexia.  As a result, Plaintiff's daughter was hospitalized and Plaintiff began

taking time off work to attend doctor's appointments and family counseling.  According

to Plaintiff, he was unaware that he was entitled to leave under the FMLA for these

absences.  Plaintiff, however, later learned through his co-workers that he was entitled to

FMLA leave for the absences related to his daughter's medical condition. Plaintiff approached Fisher and asked for the appropriate FMLA Form. According to Plaintiff, he only received a portion of the appropriate FMLA Form from Fisher. In addition, Fisher told Plaintiff to contact Susan Keith ("Keith"), AES's Human Resources Manager, for instructions on completing the FMLA Form. According to Plaintiff, Keith told him that Defendants did not provide intermittent leave to their employees. Moreover, Keith states that she told Plaintiff that in addition to submitting a complete FMLA Form, Plaintiff was required to submit a medical certification. Plaintiff never submitted the FMLA paperwork to Defendants.

On May 12, 2005, Plaintiff visited Dr. Sandra Golden for a swollen and painful right ankle. (Pl.'s Resp. Br. Ex. 7.) Dr. Golden's notes reveal that Plaintiff's "ankle pain and swelling has been longstanding. However it has been worsened by a change in his position at work, which requires him to be on his feet all day long, including 10 to 12-hour work days. [Plaintiff] states that after about 4 hours, it becomes quite painful for him to walk." (*Id.*) According to a letter dated May 12, 2005, Dr. Golden stated that Plaintiff "should avoid prolonged standing, limiting his up-time to about 3 to 4 hours in order to avoid possible complications of this condition; which can include ulceration or rupture and bleeding."[1] (Pl.'s Resp. Br. Ex. 8.) In his affidavit, Plaintiff states that Defendants did not confer with him about any accommodation that may have been needed as a result of Dr. Golden's letter. (Pl.'s Aff. ¶ 24.) Instead, Dennis Jacobs ("Jacobs"), AES's

---

[1]In his affidavit, Mr. Fisher states that he did not receive Dr. Golden's May 12, 2005 letter until May 23, 2005. (Dfts.' Br. Ex. A ("Fisher Aff.") ¶ 16.)

Director of Risk Management, sent a letter to Dr. Golden on June 2, 2005 proposing certain "things as [sic] means to alleviate the stresses from standing/walking on the concrete." (Dfts.' Br. Ex. M at 2.) Jacobs's proposals included: (1) using "soft-floor" mats; (2) urging Plaintiff to purchase "soft-soled" shoes; (3) allowing Plaintiff to sit to perform tasks whenever possible; and (4) ensuring that Plaintiff wears his compression stockings. (*Id.*) The parties dispute whether any of Jacobs's proposals were ever instituted.

On June 1, 2005, after working half his scheduled shift, Plaintiff began to experience pain in his ankle. Plaintiff states that he looked for a supervisor, and after his attempt to locate a supervisor was unsuccessful, Plaintiff asked a "co-worker, Jeff Sylver, to explain that he was leaving to go to the doctor because his ankle was inflamed and that he was in severe pain." (Pl.'s Resp. Br. at 6 (citing Pl.'s Aff. ¶ 22).) Later that day, Plaintiff went to see Dr. Golden. (Pl.'s Resp. Br. Ex. 9.) After Plaintiff's visit, Dr. Golden prepared a note indicating that Plaintiff was able to return to work on June 3, 2005. (Pl.'s Resp. Br. Ex. 10.)

On June 6, 2005, Plaintiff's next scheduled day of work, Plaintiff returned to work. The next day, Plaintiff again worked about half his scheduled shift before experiencing pain in his ankle. Plaintiff unsuccessfully attempted to find a supervisor to report his pain and left a note addressed to Johnston explaining his pain. (Pl.'s Resp. Br. Ex. 11.) As he was leaving work on June 7, 2005, Plaintiff spotted Johnston and gave him the note. Plaintiff had scheduled vacation for June 8th and 9th and was not scheduled to return to work until June 13, 2005.

On June 13, 2005, Plaintiff called to inform Johnston that he needed to take his daughter to the hospital and would not be at work. Later that day, Fisher called Plaintiff informing him that he was being terminated for failing to show up for work on June 8th and 9th. Plaintiff told Fisher that he was not at work on June 8th and 9th because these days were approved vacation days. On June 14, 2005, Keith called Plaintiff telling him that although the paperwork confirming that these were approved vacation days was found, he was still being terminated for leaving work early on June 1st and June 7th.

## II.  Standard of Review

This Court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53. It is not enough that the nonmoving party comes forward with the "mere existence of a

scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

## III. <u>Analysis</u>

### A. **Plaintiff's Affidavit**

As an initial matter, in their reply brief, Defendants argue that "Plaintiff's affidavit, at least to his contradictory testimony regarding the adverse action supporting his claims, should be stricken." (Dfts.' Rep. Br. at 2.) It is well established that "a party cannot create a disputed issue of material fact by filing an affidavit that contradicts the party's earlier deposition testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006)(citing *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997) and *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). In a recent case, the Sixth Circuit stated:

> [A] district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony. A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction. If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit "constitutes an attempt to create a sham fact issue."

*Id.* at 908 (citations omitted). "An inconsistent affidavit may preclude summary judgment, however, if the affiant was confused at the deposition and the affidavit explains those aspects of the deposition testimony . . . ." *Miller v. A.H. Robbins, Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985); *see also Aerel*, 448 F.3d at 908 (explaining that *A.H. Robbins* sets "forth instances in which 'an inconsistent affidavit may preclude summary judgment'").

Defendant argues that the following colloquy between defense counsel and Plaintiff amounts to an admission that the only adverse employment action Plaintiff is asserting in his retaliation claims is his transfer from the maintenance department to the production department:

> Q. [Defense Counsel] Are there any other reasons that you can tell us Harman or AES retaliated against you other than transferring you on April 21, 2005 to the production department when they underwent this reduction in workforce and economic reorganization?
>
> A. [Plaintiff] I guess not.

(Pl.'s Dep. at 293-94.) Assuming that this is an admission that Plaintiff's retaliation claims involve only his transfer from the maintenance department to the production department and that Plaintiff's post-deposition affidavit "directly contradicts" this alleged admission, Plaintiff's affidavit explains his confusion with respect to defense counsel's question. In his affidavit, Plaintiff states:

> During my deposition, I explained to the attorney for Harman and AES that I believed that I was retaliated against for complaining about Randy Fox showing me the nude pictures of his wife by being transferred to production in April 2005. I did not understand the questions to refer to my claims under

the FMLA and the ADA.  As I alleged in my complaint, I believe that I was retaliated against for seeking an accommodation and requesting an FMLA leave by being terminated from my employment in June 2005.  If my deposition had been completed, I would have been able to clarify my answer at that time.

(Pl.'s Aff. ¶ 28.)

This Court believes that Plaintiff's post-deposition affidavit offers a sufficient explanation of his confusion regarding defense counsel's question, at least as defense counsel's question relates to his FMLA and ADA retaliation claims.  (*See id.*)  Defense counsel's question at Plaintiff's deposition was confusing because she asked for "reasons" that Plaintiff believed he was retaliated against, as opposed to the effect of the alleged retaliation.  Moreover, Plaintiff's deposition was never completed; thus, Plaintiff never had an opportunity to further explain his retaliation claims.  Therefore, this Court is persuaded by Plaintiff's justification for his confused deposition testimony.

Nevertheless, this Court believes that the above-referenced paragraph of Plaintiff's affidavit clarifies the scope of Plaintiff's FMLA and ADA retaliation claims.  As he stated in his affidavit, Plaintiff's FMLA and ADA retaliation claims assert that the alleged adverse employment action was his termination of employment, not his transfer to the production department.  On the other hand, Plaintiff's affidavit also explains that his Title VII retaliation claim asserts that the alleged adverse employment action was his transfer to the production department.  Therefore, the Court will analyze these claims as such.

**B.    ADA Claims**

In Count I of his Complaint, Plaintiff asserts that Defendants violated the ADA.

Plaintiff contends that he "has alleged that Defendants violated the ADA in several ways – by transferring and then terminating his employment due to his disability, refusing to engage in the required interactive process and retaliating against Plaintiff for requesting an accommodation."  (Pl.'s Resp. Br. at 8.)  The Court will analyze each of these alleged violations separately.

1.  Disability Discrimination

The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  *Id.* § 12112(b)(5)(A).

In this case, Plaintiff has offered no direct evidence of discrimination by Defendants.  Therefore, Plaintiff's disability discrimination claim will be analyzed under the tripartite burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), and later refined in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981).

> Under the ADA, in the absence of direct evidence of
> disability discrimination, a plaintiff may seek to establish a
> prima facie case of discrimination.  Once established, a prima

> facie case shifts the burden to the employer to offer a
> legitimate, nondiscriminatory reason for its action.  If the
> employer articulates such a reason, the plaintiff must then
> show that the reason given by the employer is pretextual in
> order to prevail.

*Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999).

"To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that: '(1) he is disabled; (2) he is otherwise qualified for the position with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of his disability; and (5) his position remained open.'" *Brenneman v. Medcentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004)(quoting *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 446 (6th Cir. 1999)).

Defendants first contend that Plaintiff's transfer from the maintenance department to the production department does not constitute an adverse employment action under the ADA.  To constitute an adverse employment action, Plaintiff must show that the transfer to the production department "constituted a 'materially adverse' change in the terms of [his] employment." *Richards v. Sandusky Community Schools*, 102 F. Supp. 2d 753, 760 (E.D. Mich. 2000)(quoting *Kocsis v. Multi-Care Mgnt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)).  Moreover, mere "reassignments without a change in salary or work hours do not ordinarily constitute an adverse employment decision." *Kocsis*, 97 F.3d at 886.  At his deposition, Plaintiff testified that his wages remained the same after he was transferred or reassigned to the production department.[2]  (Pl.'s Dep. at 275.)  Furthermore, while

---

[2]After the transfer to the production department, Plaintiff's benefits also remained the same.  (Fisher Aff. ¶ 13.)

Plaintiff's work hours may have changed after the transfer, so too did the work hours of all of Defendants' employees. (*See* Fisher Aff. ¶ 13.) Consequently, Plaintiff's transfer or reassignment to the production department did not constitute an adverse employment decision. Therefore, to the extent that Plaintiff's disability discrimination claim is premised on his transfer, Plaintiff cannot establish a prima facie case of disability discrimination. As stated above, however, Plaintiff's disability discrimination claim is also premised on his termination of employment, which is undoubtedly an adverse employment decision under the ADA.

Next, Defendants contend that Plaintiff cannot demonstrate that he has a "disability" within the meaning of the ADA. In his response, Plaintiff argues that "[t]he varciosities in [his] right ankle is a physical impairment which limits his ability to walk and stand for prolonged periods." (Pl.'s Resp. Br. at 8.)

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). There is no dispute that Plaintiff's ankle condition is a physical impairment under the ADA; nor is there any dispute that walking and standing are "major life activities." Thus, the Court must determine if Plaintiff has presented significant probative evidence that his ankle condition "substantially limits" his ability to walk or stand.

"An 'impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation' under the ADA." *Bryson v. Regis Corp.*, 498 F.3d 561, 576 (6th Cir. 2007). As defined by the EEOC regulations promulgated pursuant to the ADA, "substantially limited" means:

> (i) Unable to perform a major life activity that the average
> person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or
> duration under which an individual can perform a particular
> major life activity as compared to the condition, manner or
> duration under which the average person in the general
> population can perform that same major life activity.

29 C.F.R. § 1630.2(j). Ultimately, "[w]hether a claimant qualifies as having a disability

requires an individualized inquiry." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483,

119 S. Ct. 2139, 2147 (1999).

The record in this case shows that Plaintiff's ability to walk and stand is only

moderately affected by his ankle condition. Dr. Golden's letter to Defendants states that

Plaintiff "should avoid prolonged standing, limiting his up-time to about 3 to 4 hours in

order to avoid possible complications of this condition; which can include ulceration or

rupture and bleeding." (Pl.'s Resp. Br. Ex. 8.) Dr. Golden also indicated that after

spending three to four hours standing, Plaintiff should elevate his feet.[3] Nonetheless, Dr.

Golden later qualified this recommendation by stating that "[s]hould [Plaintiff] not be

able to [elevate his feet after three to four hours of standing], he should definitely do that

---

[3]In support of his contention that he has a "disability" within the meaning of the
ADA, Plaintiff relies on *Ballard v. Potter*, No. IP-01-0271-C-H/F, 2002 WL 31045359
(S.D. Ind. Aug. 28, 2002). The plaintiff in *Ballard*, however, proffered evidence that she
could not "walk and stand for more than a total of four hours a day." *Id.* at *3. Even
assuming that *Ballard* was the law in the Sixth Circuit, this Court believes that it is
factually distinguishable from this case. In this case, Plaintiff offers evidence that he
*should* not stand for more than three to four hours at a time before taking a break to
elevate his feet. Moreover, Plaintiff testified at his deposition that he can walk around the
block and walk around Harman's Rochester, Michigan facility. This evidence is much
different than the unqualified limitation on walking and standing in *Ballard*.

at the end of the day with elevation."[4]  (Dfts.' Br. Ex. J at 2.)  Moreover, Plaintiff's

deposition testimony reveals that he is able to walk around the block and walk around

Harman's Rochester facility.  (*See* Pl.'s Dep. at 244-45.)  This Court does not believe that

this evidence is sufficient to establish that Plaintiff was, at the time of his termination,

substantially limited with respect to his ability to stand and walk.  *See, e.g., Bryson*, 498

F.3d at 576 (holding that a plaintiff who "testified that she can stand for fifteen to twenty

minutes at a time and sometimes for '[a]n hour, an hour and a half, two hours. . . .' [and]

simply cannot stand 'all day like [she] used to'" is insufficient to establish that she is

substantially limited with respect to standing and walking); *Penny v. United Parcel Serv.*,

128 F.3d 408, 415 (6th Cir. 1997)(granting summary judgment when the plaintiff failed to

adduce any evidence "from which a factfinder reasonably could conclude that the nature

and severity of his injury significantly restricted his ability to walk as compared with an

average person in the general population").

Because Plaintiff cannot establish that his ankle condition constitutes a "disability"

under the ADA, he cannot establish a prima facie case of disability discrimination.

Consequently, Defendant is entitled to summary judgment as to Plaintiff's disability

discrimination claim.

2.  <u>Defendants' Alleged Failure to Engage in the Interactive Process</u>

Plaintiff also contends that Defendants violated the ADA by failing to engage in the

required interactive process to determine the appropriate reasonable accommodation.  In

---

[4]Dr. Golden also repeatedly recommended that Plaintiff "pursue treatment of
varicose veins with Dr. Stutz . . . ."  (Dfts.' Br. Ex. J at 2.)

so arguing, Plaintiff relies on an EEOC regulation, which provides:

> To determine the appropriate reasonable accommodation, it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). This Court believes that based on this regulation, the required interactive process is predicated on a plaintiff having a "disability" within the meaning of the ADA. *See id.* Having already determined that Plaintiff has failed to present evidence from which a reasonable juror could conclude that he has a "disability," this Court need not determine whether Defendants failed to engage in the interactive process under the above-referenced EEOC regulation.

### 3. Retaliation for Requesting an Accommodation

In addition to claiming that he was discriminated against on the basis of his alleged disability, Plaintiff also alleges that Defendants retaliated against him for requesting an accommodation. "A plaintiff may prevail on a disability-retaliation claim 'even if the underlying claim of disability fails.'" *Bryson*, 498 F.3d at 577 (quoting *Soileau v. Guilford of Me.*, 105 F.3d 12, 16 (1st Cir. 1997)). The same tripartite burden-shifting framework applicable to Plaintiff's disability-discrimination claim applies to his disability-retaliation claim. According to the Sixth Circuit:

> To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in a protected activity; (2) that he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action. If the plaintiff establishes a prima facie case

> of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff, of course, bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination.

*Penny*, 128 F.3d at 417 (citations omitted).

This Court believes that Plaintiff can establish a prima facie case of retaliation under the ADA. A good-faith request for a reasonable accommodation under the ADA is a protected activity. *Conley v. United Parcel Serv.*, 88 F. Supp. 2d 16, 20 (E.D.N.Y. 2000). Here, the record indicates that Plaintiff requested, through Dr. Golden, that Defendants permit Plaintiff to "avoid prolonged standing, limiting his up-time to about 3 to 4 hours." (Pl.'s Resp. Br. Ex. 8.) Furthermore, there is no dispute that Plaintiff's termination constitutes an adverse employment action. Finally, Plaintiff argues that "the close proximity between the protected activity and the termination," the fact that he "was never criticized for his attendance until he engaged in the protected activity," and the fact that "employees with far more egregious abuse of the attendance policy only received warnings despite more than 90 documented incidents in a single year" are all sufficient to establish the "causal connection" element of a prima facie case of retaliation under the ADA. (Pl.'s Resp. Br. at 11 (citing Exs. 16 and 17).) This Court agrees with Plaintiff and believes that the close proximity between Plaintiff's termination and his good-faith request for an accommodation and the fact that other employees with many more absences only received warnings are sufficient to establish a jury question as to the "causal connection" element of a prima facie case of disability retaliation.

In their briefs, Defendants rely on Plaintiff's transfer to the production department

as the "adverse employment action." At the hearing, however, Defendants argued that Plaintiff was terminated for leaving work early on June 1st and June 7th. There is evidence in the record confirming that Plaintiff was terminated for leaving work early on these days. (*See* Keith Dep. 21-23; Pl.'s Aff. ¶ 26.) Accordingly, Defendants have carried their burden in presenting a legitimate, non-discriminatory reason for terminating Plaintiff.

Nevertheless, this Court believes that there are genuine issues of material fact with respect to whether Defendants' legitimate, non-discriminatory reason for terminating Plaintiff was pretextual. As stated above, Plaintiff has proffered evidence showing that employees with much more egregious attendance records were not terminated; instead, these employees were only given written warnings or were suspended. (*See* Pl.'s Resp. Exs. 16 and 17.) Based on this evidence, a reasonable jury could infer that Defendants' proffered reason for terminating Plaintiff was pretextual. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)(holding that a plaintiff can show pretext by proffering "evidence that other employees . . . were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff"); *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003).

Furthermore, Defendants' changing rationale for terminating Plaintiff is also evidence from which a reasonable jury could find pretext. *See Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996)("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.") Plaintiff was initially told

that he was being terminated for failing to show up for work on June 8th and 9th. (Pl.'s Aff. ¶ 25.) However, once Defendants learned that Plaintiff had scheduled vacation for these days, Keith then called Plaintiff and told him that he was being terminated for leaving work early on June 1st and 7th. (*Id.* ¶ 26.)

Because Plaintiff has pointed to evidence in the record from which a reasonable jury could infer that Defendants' proffered reason for his termination was pretextual, summary judgment is not warranted on Plaintiff's ADA retaliation claim.

### C. FMLA Claims

In Count II of his Complaint, Plaintiff alleges that Defendants violated the FMLA by interfering with his right to take intermittent leave and by retaliating against him for allegedly requesting FMLA leave. As relevant to this case, the FMLA entitles a qualifying employee to up to twelve weeks of leave during any twelve-month period: (1) "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition;" or (2) if an employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 28 U.S.C. § 2612(a)(1)(C)-(D). Leave under the FMLA includes intermittent leave. *See* 29 C.F.R. § 825.203. A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11).

#### 1. FMLA Interference Claim

The genesis of an FMLA interference claim is found in 29 U.S.C. § 2614(a)(1),

which provides that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in" the FMLA. *See also* 29 C.F.R. § 825.220(b)("Any violations of the [FMLA] or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the [FMLA].") "To prevail on an interference claim, a plaintiff must establish that (1) he is an 'eligible employee,' 29 U.S.C. § 2611(2); (2) the defendant is an 'employer,' 29 U.S.C. § 2611(4); (3) the employee is entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee FMLA benefits to which he was entitled." *Cavin v. Honda of Am. Mfg, Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)(citations omitted).

Defendants argue that Plaintiff's FMLA interference claim must fail. While Defendants do not specifically point to any one particular prong of an FMLA interference claim that Plaintiff cannot establish, Defendants contend that Plaintiff failed to proffer a medical certification after Defendants requested one, failed to complete Defendants' FMLA Form, and failed to "provide any discernable information regarding his FMLA inquiry." (Dfts.' Rep. Br. at 3.) Plaintiff does not directly address Defendants' contentions but seems to suggest that he did not submit the FMLA paperwork because Keith allegedly told him that intermittent leave was not available.

To ascertain whether an employee is eligible for FMLA benefits, an employer can require an employee to submit a medical certification in support of his or her request for FMLA leave. *See* 29 U.S.C. § 2613(a); 29 C.F.R. § 825.305(a). Generally, an employee

has 15 days after the employer's request to submit the requested medical certification. 29 C.F.R. § 825.305(b). An employer's request for a medical certification can be in oral or written form. *See id.* § 825.305(a).

In the case at bar, "just after" his April 25, 2005 transfer to the production department or sometime in "late April, early May" 2005, (Pl.'s Resp. Br. Ex. 13, Fisher Dep. at 18, 20), Plaintiff asked Fisher for intermittent FMLA leave for the absences related to his ankle condition or his daughter's anorexia. (Pl.'s Aff. ¶ 16.) Fisher gave Plaintiff some paperwork and directed Plaintiff to contact AES for directions on how to complete the paperwork. (*Id.*) Pursuant to Fisher's instructions, Plaintiff contacted AES and spoke with Keith over the telephone. During their telephone conversation, Keith informed Plaintiff that he had an incomplete version of the FMLA Form. (Dfts.' Mot. Ex. B, Keith Aff. ¶ 5.) Moreover, according to Keith, Plaintiff told her that he was seeking leave to care for his daughter, who at the time was suffering from anorexia. (Dfts.' Mot. Ex. 14, Keith Dep. at 17.) Keith told Plaintiff that "he needed to obtain the entire FMLA Form (it appeared he was missing one page of the two page form), he needed to complete the FMLA Form, he needed to obtain a medical certification for any claimed 'serious health condition' (i.e., his daughter's condition), and he needed to submit the completed FMLA Form and medical certification." (Keith Aff. ¶ 6.) Plaintiff never submitted the requested medical certification to AES or Harman because he claims that Keith told him that he "could not take periodic or intermittent leave because the company did not offer that kind of leave." (Pl.'s Aff. ¶ 17.) Plaintiff, however, does not dispute that Keith told

him that he needed to obtain and submit a medical certification.[5]

Even when construed in a light most favorable to Plaintiff, the facts in this record indicate that Plaintiff failed to timely submit the medical certification. According to Fisher, Plaintiff spoke with him about intermittent leave in early May 2005. (*See* Fisher Dep. at 18, 20.) Plaintiff's affidavit indicates that he then "immediately called" Keith. (Pl.'s Aff. ¶ 17.) Nonetheless, Plaintiff never submitted the requested medical certification before he was terminated by Keith on June 14, 2005.[6] Because Plaintiff failed to submit a medical certification within 15 days after such medical certification was requested by AES, Plaintiff has failed to establish that he would have been entitled to FMLA leave. *See* 29 U.S.C. § 2613(a). Consequently, Plaintiff's FMLA interference claim must fail. *See Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 567 (6th Cir. 2005)(concluding that a plaintiff's FMLA interference claim fails because the plaintiff did not submit a certification form within the deadline imposed by the employer).

    2.    <u>FMLA Retaliation Claim</u>

In addition to allowing for an interference claim, the FMLA permits an employee to seek recovery under a retaliation theory. *See* 29 U.S.C. § 2615(a)(2). FMLA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Edgar v.*

---

[5]This requirement is also set forth in the Employee Handbook prepared by AES for Harman. (*See* Dfts.' Br. Ex. J at 10.) Plaintiff acknowledged that he received the Employee Handbook. (Pl.'s Dep. at 193-95, 199-200.) This requirement was also set forth on the first-page of AES's form entitled "Request for FMLA Leave." (Dfts.' Br. Ex. R.)

[6]Nor has Plaintiff alleged or argued that he was in the process of obtaining the requested medical certification before he was terminated.

*JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006). To establish a prima facie case of retaliation under the FMLA, Plaintiff must demonstrate that: (1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising his rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an adverse action against him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Killian v. Yorozu*, 454 F.3d 549, 556 (6th Cir. 2006)(citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)).

Plaintiff argues that he satisfies the elements of a prima facie case of retaliation under the FMLA. Plaintiff contends that he requested FMLA leave from both Fisher and Keith. Moreover, Plaintiff contends that "[h]e was terminated on June 7, 2005 for allegedly abandoning his job when he left work on June 1 and June 7 due to severe pain and inflammation in his ankle caused by variscosis, the condition for which he sought the leave." (Pl.'s Resp. Br. at 15.) Plaintiff also argues that the close proximity between his request for FMLA leave and his termination is sufficient to establish a causal connection. (*See id.*) Defendants take issue with Plaintiff's ability to establish a causal connection. More specifically, Defendants contend that "mere temporal proximity between inquiring about FMLA leave and the transfer [or termination], is insufficient, standing alone, to establish a causal connection." (Dfts.' Br. at 16.)

This Court believes that Plaintiff can establish a prima facie case of retaliation under the FMLA. Although the Sixth Circuit has held that temporal proximity between the FMLA-protected activity and the adverse employment action alone is insufficient to

"survive summary judgment," *Chandler v. Specialty Tires of Am., Inc.*, 283 F.3d 818, 826 (6th Cir. 2002), this Court believes that the same evidence Plaintiff proffered in support of the causal connection element of his ADA retaliation claim supports the "causal connection" element of its FMLA retaliation claim. *See supra* pages 17-18. Also, for the reasons set forth above in the Court's analysis of Plaintiff's ADA retaliation claim, there are genuine issues of material fact as to whether Defendants' proffered reason for terminating Plaintiff was pretextual. *See supra* page 18-19.

### D. Title VII Retaliation Claim

Count III of Plaintiff's Complaint, alleges that Defendants retaliated against Plaintiff for filing a hostile work environment complaint as a result of Randy Fox showing Plaintiff nude pictures of his wife in violation of Title VII of the 1964 Civil Rights Act. Title VII makes it unlawful for an employer "to discriminate against any . . . employee . . . because [the employee] . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII retaliation claim are analyzed under the *McDonnell Douglas* burden-shifting framework. *Clay v. United Parcel Serv.*, 501 F.3d 695, 713 (6th Cir. 2007).

As stated above, Plaintiff's Affidavit explains that his Title VII retaliation claim asserts that Defendants retaliated against him for filing a hostile work environment complaint by transferring him to the production department. In their brief in support, Defendants argue, *inter alia*, that Plaintiff's Title VII retaliation claim must fail because Plaintiff "cannot establish a causal link between the report of the incident [involving

Randy Fox] and his transfer." (Dfts.' Br. at 18.)

This Court agrees with Defendants. To establish a prima facie case of retaliation under Title VII, Plaintiff must demonstrate, among other elements, the existence of a "causal connection" between the protected activity and the resulting adverse employment action. *Singfiled v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004). This Court believes that Plaintiff has failed to adduce sufficient evidence to show that he can establish the requisite causal connection. In this case, the underlying hostile work environment complaint was that Randy Fox showed Plaintiff the nude pictures of his wife in early 2005. Plaintiff suggests that the close proximity between his April 2005 complaint and the April 21, 2005 notice of transfer is sufficient to establish a causal connection between Plaintiff's complaint and the alleged adverse employment action. Aside from this suggestion, Plaintiff fails to point to any other evidence that his transfer was in any way related to his complaint about Randy Fox showing him nude pictures of his wife. Because temporal proximity alone is insufficient to establish a causal connection between the retaliatory conduct and the protected activity under Title VII, *Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006)(citations omitted), Plaintiff cannot establish a prima facie case of retaliation under Title VII.

Moreover, even if Plaintiff could establish a prima facie case of retaliation under Title VII, this Court believes that Plaintiff has failed to designate evidence establishing a genuine issue of material fact as to whether Defendants' legitimate, non-discriminatory reason for his transfer was pretextual. Defendants state that Plaintiff's transfer to the production department, which was the result of a plant-wide reorganization, was

necessitated by "severe economic pressures and substantial financial losses that threatened Harman's continued existence." (Fisher Aff. ¶ 6.) Plaintiff has failed to offer any evidence or argument as to why Defendants' legitimate, non-discriminatory reason for his transfer to the production department was pretextual. Therefore, because Plaintiff has failed to adduce evidence showing that a genuine issue of material fact exists as to whether Defendants' reason for his transfer was pretextual, Defendants are entitled to summary judgment on Plaintiff's Title VII retaliation claim for this additional reason.

## IV.  <u>Conclusion</u>

In conclusion, this Court believes that summary judgment in favor of Defendants is appropriate as to Plaintiff's (1) disability discrimination claim under the ADA, (2) interference claim under the FMLA, and (3) retaliation claim under Title VII.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  Defendants' motion is **GRANTED** with respect to Plaintiff's disability discrimination claim under the ADA, interference claim under the FMLA, and retaliation claim under Title VII.  Defendants' motion is **DENIED** with respect to Plaintiff's retaliation claims under the ADA and the FMLA.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Beth M. Rivers, Esq.
Jeanne E. Mirer, Esq.
Stuart M. Schwartz, Esq.
Tova Shaban, Esq.